**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Dwayne Stoutamire, | : | Case No. 4:10 CV 2657 |
| Petitioner, | : | |
| vs. | : | |
| Donald Morgan, Warden, | : | **MAGISTRATE'S REPORT AND RECOMMENDATIONS** |
| Respondent. | : | |

Pursuant to 72.2(b)(2) of the UNITED STATE DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES, this case was automatically referred to the undersigned Magistrate Judge for report and recommendation.  Pending are Petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28 U. S. C. § 2254, Respondent's Answer/Return and Petitioner's Reply to the Answer/Return (Docket Nos. 1, 24 & 31) and Petitioner's Motion for Change of Address (Docket No. 37).  For the reasons that follow, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus.

## I. PROCEDURAL AND FACTUAL BACKGROUNDS.

### A.   Indictment, Conviction and Sentencing.

During the January 2007 term, the grand jurors of Trumbull County, Ohio, returned the following indictment against Petitioner:

| COUNT | CHARGE | SPECIFICATION |
|-------|--------|---------------|
| 1 | ATTEMPTED MURDER | FIREARM |
| 2 | HAVING WEAPONS UNDER DISABILITY | |
| 3. | FELONIOUS ASSAULT | FIREARM |
| 4. | HAVING WEAPONS UNDER DISABILITY | |
| 5. | ABDUCTION | FIREARM |

(Docket No. 24. Exhibit 1, pp. 5-10 of 277).

Subsequently on March 16, 2007, a superseding indictment was filed adding Count 6, charging aggravated robbery with a firearm specification in violation of OHIO REV. CODE §§ 2913.01, 2911.01 (A) (1) and (C) and 2941.145 (Docket No. 24, Exhibit 1, pp. 12-18 and 118 of 277).

After deliberation, the jury rendered a verdict on May 14, 2007 in which they found Petitioner not guilty on count one and guilty on counts two, three, four, five and six (Docket No. 24, Exhibit 1, pp. 44-45 of 277).  On August 7, 2007, the court ordered that Petitioner serve prison terms of:

| COUNT | PRISON TERMS FOR THE VIOLATION | PRISON TERM FOR THE SPECIFICATION |
|-------|-------------------------------|-----------------------------------|
| 2 | FOUR YEARS | NONE |
| 3 | SEVEN YEARS FOR THE UNDERLYING OFFENSE | MANDATORY THREE YEARS FOR FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVELY TO THE UNDERLYING SENTENCE |
| 4 | FOUR YEARS | |
| 5 | FOUR YEARS FOR THE UNDERLYING OFFENSE | MANDATORY THREE YEARS FOR THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVELY TO THE UNDERLYING SENTENCE. |
| 6 | NINE YEARS FOR THE UNDERLYING OFFENSE | MANDATORY THREE YEARS FOR THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVELY TO THE UNDERLYING SENTENCE. THIS SENTENCE IS MERGED WITH THE SENTENCE IN COUNT THREE FOR SENTENCING PURPOSES. |

All sentences were to be served for an aggregate sentence of thirty four years (Docket No. 24, Exhibit 1, pp. 44-46, 50-52 of 277).

2

**B.**     **Direct Appeal.**

Petitioner filed a notice of appeal on August 20, 2007 (Docket 24, Exhibit 1, p. 47 of 277).  On

December 10, 2007, Petitioner filed a brief in which he asserted five assignments of error:

1.     The trial court failed to grant relief from prejudicial joinder under OHIO CRIM. R. 14, denying Petitioner a fair trial.

2.     The trial court erred when it instructed the jury on complicity after the jury deliberation had begun.

3.     The trial court erred when it refused to give a jury instruction on unlawful restraint as a lesser included offense of abduction.

4.     The trial court denied Petitioner due process under the Fourteenth Amendment in that his conviction was against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and the testimony presented.

5.     Petitioner was denied his right to a fair trial in violation of the United States Constitution, Amendments VI and XIV, as a result of the cumulative error which occurred throughout the trial.

(Docket No. 24, Exhibit 1, pp. 55-58 of 277).

On June 16, 2008, the Court of Appeals for the Eleventh Appellate District affirmed the

judgment of the trial court, overruled all of Petitioner's assignments of error and made findings of fact

(Docket No. 24, Exhibit 1, pp. 117-147 of 277).  Under the ANTITERRORISM AND EFFECTIVE DEATH

PENALTY ACT of 1996 (AEDPA), PUB. L. NO. 104-132, 110 Stat. 1277, these findings of fact made by

a state court are given deference and therefore presumed to be correct[1].  *Keith v. Mitchell*, 455 F. 3d

662, 666 (6th Cir. 2006) (*citing* 28 U.S.C. § 2254(e)(1) (Thomson Reuters 2011)).

---

[1]

        In his Reply to Respondent's Answer, Petitioner fails to present clear and convincing evidence rebutting the presumption but he undertakes a challenge to the Court to "disregard" the facts made by the appellate court and conduct an independent review of facts.  The Magistrate reminds Petitioner that federal courts are not forums in which to relitigate state trials.  *See Crosky v.* Sheets, 2011 WL 1812430, *12 (S. D. Ohio 2011) (*citing Barefoot v. Estelle*, 103 S. Ct. 3383, 3391 (1983)).

**The Shooting Incident**.

The testimony and evidence reflects that on January 9, 2007, a robbery shooting occurred at an apartment complex in Warren at approximately 11:00 p.m.  The victim, Antonio Peterman ("Mr. Peterman"), was shot in the thigh and stomach, while he was in his car in the parking lot of the apartment complex.

David Palm ("Mr. Palm"), along with his wife, Jami Lynn, and his mom, Sally Jo, had driven to Mr. Peterman's girlfriend's apartment complex in order to purchase some crack cocaine.  Knowing Mr. Peterman was quite particular about the condition of his Cadillac and as snow was beginning to fall, Mr. Palm entered Mandy Stewart's ("Ms. Stewart") apartment and informed Mr. Peterson that his car window was rolled down.  Mr. Palm then purchased $315 of crack and left $320 on the kitchen table before leaving since Mr. Peterman did not have change.

Ms. Stewart testified that about five minutes later Mr. Peterman put on his winter jacket and went outside to attend to the car window as snow was now heavily falling.  She heard gunshots and looked out the window.  But when she saw the dome light on in his Cadillac and Mr. Peterman moving about in the car with the car door open, she assumed the shots had nothing to do with her boyfriend.  She did see Mr. Palm driving away in his own car.  About two minutes later neighbors began beating on her door, informing her that Mr. Peterman had been shot and that 911 had already been called.

The neighbors, September Allen ("Ms. Allen"), Felicia Mitchell ("Ms. Mitchell"), and Marquerita Patterson ("Ms. Patterson"), had been playing X-box in Samantha Bumbico's ("Ms. Bumbico") apartment when they heard the gunshots. Ms. Mitchell heard someone yell from inside the apartments that somebody had been shot.  As they headed outside, Ms. Allen called 911 and then passed the phone to Ms. Mitchell.  Ms. Allen saw someone wearing a "hoodie" leave the front seat of Mr. Peterman's car and start running towards the A building.  Ms. Bumbico saw two people standing in front of the Cadillac who then began running separate ways, one towards the right of the A building, and one towards the left.  One was wearing a dark hoodie, while the other was wearing a red one.  She saw them both run in the direction of a red car.  She then went outside and as she was in the rear seat of the Cadillac with Mr. Peterman, she saw the headlights of a vehicle leaving.

Other neighbors also witnessed the shooting. Marquerita Patterson, who lived in the A building, saw someone running towards her building.  She later went outside and noticed footprints in the snow. Peggy McClintock, who lived in the D building, heard glass break.  When she looked out the window she saw a person running from in between the cars.  That person fell on the snow, and she saw that he had a gun in his hands. Ms. Mary Anderson, who lived in the same building as Ms. Stewart, the C building, also heard two or three gunshots, but observed nothing when she looked outside the window.

Sergeant Martin Gargas ("Sergeant Gargas") was the first to arrive on the scene.  He observed that Mr. Peterman appeared to be in shock.  When asked who did this, Mr. Peterman replied that he did not know.  Sergeant Gargas noticed shell casings outside of the car that were later identified as being from a .40 caliber weapon.

EMS soon arrived on the scene, and Julie Knowlton ("Ms. Knowlton") attended to Mr. Peterman. He was breathing heavily, but still talking and complaining of pain.  The back passenger door was open, and she observed a gunshot wound to his right thigh.  On further examination she discovered a wound to his abdomen.  As they transported Mr. Peterman to Trumbull Memorial Hospital, he began to have difficulty breathing and then stopped breathing altogether.  Although the rescue team revived him, he remains in a comatose state today.

4

Dr. Stantucio Ricciardi, Mr. Peterman's physician, testified that Mr. Peterman has a resultant severe brain injury.  He cannot communicate, swallow, eat, or breathe on his own and is receiving nutrition by way of a feeding tube.

When Detective Wayne Mackey ("Detective Mackey") arrived at the scene, Mr. Peterman was already en route to the hospital.  Surveying the scene, he observed two sets of footprints around building A. One tracked around the right side of the building, the other around the left.

Detective Sergeant Michael Merritt ("Detective Merritt"), a crime scene investigator, arrived at the scene and took custody of the two shell casings.  He observed that the driver's side window of Mr. Peterman's Cadillac was blown out and that blood was everywhere, but no blood samples were taken for testing. Due to the snow storm, no fingerprints were recovered.  The footprints were not photographed because none were legible, having been quickly erased by the snow.  When Ms. Stewart returned to her apartment, the $320 Mr. Palm had left on the table was missing.

**The Domestic Dispute**.

The second incident occurred on February 19, 2007.  At about 3:00 a.m. Mr. Stoutamire's girlfriend, Jessica Gordon ("Ms. Gordon"), had been drinking heavily with a girlfriend, "Jen," who dropped her off at Mr. Stoutamire's mother's home.  Mr. Stoutamire was in his mother's car, and Ms. Gordon stepped out of Jen's car into Mr. Stoutamire's car.  As the couple drove around the city, Ms. Gordon continued to drink and they began arguing about whether she was sleeping with Mr. Stoutamire's friend, "Red."  Mr. Stoutamire grew very angry and drove her to Red's house.  The couple went into Red's house.  Mr. Stoutamire left, and returned a couple of minutes later, and ordered to Ms. Gordon: "Let's go," as he dragged her out of the house.

Ms. Gordon testified that she would have left with him peacefully had he been calm.  Instead he pulled her out of the house by her coat, ripping the arms and sleeves.  The two began fist-fighting, and Mr. Stoutamire hit her in the face, giving her a black eye and a swollen lip.  Mr. Stoutamire put her in the car.  She tried to get out, but Mr. Stoutamire, with a .38 special in hand ordered her to get in the car, saying "Get in the car.  You want to get shot?"  When the police arrived she ran to them crying hysterically.  She told them that Mr. Stoutamire had a gun, and they arrested him.

The police had been called to the scene by Red's neighbors.  Neighbor, Annette Walton, heard a girl screaming.  She did not know who called the police, but three police vehicles eventually arrived on the scene. When the first car arrived, she saw a girl, presumably Ms. Gordon, throw herself on the car and cry, "Help me, help me."  Patrice Rice ("Ms.Rice"), another neighbor, called 911 when she saw that Mr. Stoutamire had a gun.  She observed Mr. Stoutamire trying to force Ms. Gordon out of the car, and she saw him pull out a gun and put it by her head.

Officer Jeffrey A. Miller ("Officer Miller") received the dispatch regarding the dispute at approximately 3:39 a.m.  When he arrived on scene, Ms. Gordon jumped out of the car and told him that Mr. Stoutamire had a gun and was trying to kill her.  She appeared "beat up" with a bloody lip, red face, and a torn shirt. Officer Sean Stephens ("Officer Stephens") was the second officer to arrive on the scene. After detaining Mr. Stoutamire, he checked the vehicle, and located a silver revolver, a .38 special, with a wooden handle under the driver's seat of the vehicle.

**The Domestic Dispute Produces a Lead in the Shooting Investigation**.

Ms. Gordon then met with Detective Michael Krafcik ("Detective Krafcik"). After discussing the events of the domestic dispute, she began discussing the events surrounding the robbery shooting. She told Detective Krafcik that on January 9th, she was getting a tattoo and received a call from Mr. Stoutamire and his friend, Fred Brady ("Mr. Brady").  They told her that they needed a ride.  When she

5

picked them up they both appeared "nervous and antsy." She dropped Mr. Brady off near Trumbull Memorial Hospital and noticed that Mr. Brady was carrying a plastic bag of what appeared to be clothes. She dropped Mr. Stoutamire at her home and returned to the tattoo artist. When she later returned home, Mr. Stoutamire told her "that Fred had-they were supposed to rob someone" and that someone had been shot in the leg and side. He also told her that "we think the guy was dead." When asked whether Mr. Stoutamire said who did the shooting, she testified that Mr. Stoutamire said, "We." Mr. Stoutamire then told her that he did not "get anything" from the robbery. She noticed that Mr. Stoutamire had small red drops of what appeared to be blood on his jeans.

After she finished relaying this information, Ms. Gordon gave Detective Krafcik five bullets in a brown paper bag, together with a plastic bag of clothes that were supposedly Mr. Brady's. The bullets were later identified as fitting a .40 caliber weapon. She told Detective Krafcik that Mr. Stoutamire was currently wearing the same pair of jeans he had worn on January 9 and that Mr. Brady drove a maroon car. She also told him that she had washed the jeans at least two or three times since the night of the shooting.

During his interview with Ms. Gordon, Detective Krafcik also learned of Allen Reynolds, also known as "Skee," who is a cousin of Mr. Brady. At trial, Skee testified that he was familiar with Mr. Peterman through his cousin, and that he lived about six or seven minutes away by car, or fifteen minutes on foot from Mr. Peterman's apartment. He told the jury that on the night of January 9, Mr. Brady and Mr. Stoutamire appeared at his house a little after 11:00 p.m., knocking on the door "like 20 dogs were chasing him." Mr. Brady appeared paranoid and was "throwing up." He would not tell Skee what happened, and asked for a trash bag. Mr. Brady and Mr. Stoutamire then removed their outer layer of clothes, and put them in the bag. Skee also observed red spots on Mr. Stoutamire's jeans. According to Skee, Mr. Stoutamire told him "I got into a confrontation but its all good though I only hit the dude twice in the leg and chest." Three days later, Skee discovered that Mr. Peterman had been shot.

Joseph Brown ("Mr. Brown"), an associate of Mr. Stoutamire and Mr. Brady, testified that on the night before the shooting, on January 8, he, Mr. Brady, and Mr. Stoutamire were discussing possible robbery targets. Mr. Brady went down a list of names and mentioned Mr. Peterman. Mr. Stoutamire then remarked that he was "willing to hit anybody" and that "he was thirsty to do a lick." Mr. Brown claimed they "were just BS-ing."

Forensic testimony was offered by Brenda Gerardi, a scientist for the Ohio Bureau of Criminal Identification and Investigation ("BCI & I"). She conducted a DNA analysis on the clothing in the bags provided to the police by Ms. Gordon, and on Mr. Stoutamire's jeans. She found mixed partial DNA of Ms. Gordon and Mr. Stoutamire on the jeans, but no DNA from either Mr. Brady or Mr. Peterman. She indicated that DNA can be washed out of clothes.

Donna Rose ("Ms. Rose"), of BCI's trace evidence unit, conducted gunshot residue ("GSR") tests. Samples were obtained from the three members of the Palm family and another man who was with them that night, Michael McClain. Only Mr. Palm tested positive for particles that are indicative of GSR, but as Ms. Rose testified, that does not necessarily mean he handled a gun. Rather, she explained he could have been near a gun when it went off or handled an item that had GSR on it. Mr. Palm testified that he and his entourage did go to Mr. Peterman's apartment in his red jeep to buy cocaine, but denied handling a firearm that night.

Tara Talbert ("Ms.Talbert") testified for the defense as an alibi witness. Mr. Stoutamire is her godmother's son, and Mr. Reynolds, as well as Mr. Brady, are relatives. She had been staying on and

off at Mr. Stoutamire's mother's house because her child had burned down her home a few days before. On the night of January 9 she testified that she heard Mr. Stoutamire leave at around 11:30 p.m., but she was unsure as to the exact time. Ms. Talbert met Ms. Gordon through Mr. Brady, who at the time was dating Mr. Brady. Ms. Gordon, however, denies that she was ever involved with Mr. Brady. Ms. Talbert also testified that she saw Ms. Gordon on the night of the shooting at a friend's house who lived about three doors down, and that Ms. Gordon showed her the new tattoo she had just received, which depicted Mr. Stoutamire's nickname, "Ziggy."

(Docket No. 24, Exhibit 1, pp. 167-175 of 277); *State v. Stoutamire*, 2008 WL 2404739, \*1 -5

(2008).

**C.      Appeal to the Ohio Supreme Court**.

Petitioner filed a timely notice of appeal in the Ohio Supreme Court on July 31, 2008 (Docket

No. 24, Exhibit 1, p. 148). In the memorandum in support of jurisdiction, Petitioner raised four

propositions of law:

1.      A jury instruction given after jury deliberations begin, when the evidence does not support the charge, and for which a defendant had no prior notice and is not afforded an opportunity to address at trial is prejudicial.

2.      Joinder of offense from two separate incidents involving different crimes at different times at different locations on different dates involving different victims, different witnesses, different investigating officers and completely different evidence is improper and prejudicial.

3.      When a charge of abduction is tried and the evidence is presented that there was no force or threat of force, an instruction of unlawful restraint is relevant and necessary for the jury to evaluate the evidence.

4.      A conviction obtained when there is cumulative error and when that conviction is against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented is a violation of the due process.

(Docket No. 24, Exhibit 1, p. 151 of 277).

On October 29, 2008, Chief Justice Thomas J. Moyer entered an order denying Petitioner leave

to appeal. The case was dismissed for the reason that there was no substantial constitutional question

7

(Docket No. 24, Exhibit 1, p. 215 of 277).

**D.     Requests for Post-Conviction Relief.**

    **a.     The First Motion for Post Conviction Relief.**

On April 28, 2008, Petitioner filed a petition to vacate or set aside conviction and sentence in the Court of Common Pleas for Trumbull County, Ohio.  In the petition, Petitioner requested an evidentiary hearing and/or that his convictions be voided because:

1.     The state failed to disclose the criminal records of several of their witnesses.

2.     Without the information required to be disclosed, Petitioner was denied equal protection and benefit of laws, the effective assistance of counsel, compulsory process and the right to confront witnesses.

3.     The state failed to offer any evidence that Petitioner was the principal offender in the Peterman incident.

(Docket No. 24, Exhibit 1, pp. 216-227 of 277).

The state filed a "motion for summary judgment" (Docket No. 24, Exhibit 2, pp. 5- 20 of 291).  On September 23, 2008, Judge W. Wyatt McKay granted the motion for summary judgment and dismissed the petition to set aside the conviction (Docket No. 24, Exhibit 2, pp. 125-128 of 291).  Petitioner appealed the dismissal to the Eleventh District Court of Appeals on October 17, 2008 (Docket No. 24, Exhibit 2, p. 129 of 291).  Petitioner asserted three assignments of error:

1.     The trial court erred in granting summary judgment and denying Petitioner an evidentiary hearing on his petition for post conviction relief, violating Ohio's Due Process Clause.

2.     The trial court erred by denying Petitioner a hearing on his petition, depriving him of liberties secured by the Fourteenth Amendment to the United States Constitution.

3.     The trial court erred by failing to grant Petitioner leave to amend his post-conviction petition.

(Docket No. 24, Exhibit 2, p. 141-142 of 291).

8

On February 17, 2009, Petitioner filed a delayed application for reconsideration/reopening of appeal alleging ineffective assistance of trial and appellate counsel (Docket No. 24, Exhibit 3, pp. 161-163 of 241).  Petitioner filed an "amendment of APP. 26 and APP. 14(B)" on February 23, 2009, asserting an additional basis for his claim of ineffective representation (Docket No. 24, Exhibit 3, pp. 196-197 of 241).  On March 31, 2009, the court of appeals denied the motion (Docket No. 24, Exhibit 3, pp. 207-214 of 241).

On November 30, 2009, the court of appeals found that all of Petitioner's assignments of error were without merit.  The judgment of the trial court was affirmed (Docket No. 24, Exhibit 2, pp. 214-232 of 291).  Petitioner's notice of appeal to the Ohio Supreme Court was received on January 14, 2010 (Docket No. 24, Exhibit 2, pp. 234-235).  The five propositions presented to the Ohio Supreme Court to support jurisdiction were:

1.     Failure of the government to disclose impeachment material is a denial of due process and liberties secured by the Ohio Constitution.

2.     A prima facie demonstration of a *Bagley*[2] violation warrants an evidentiary hearing on a petition for post-conviction relief.

3.     A showing of materiality for a *Brady*[3]/*Bagley* violation does not require demonstration by a preponderance of evidence that disclosure of the suppressed evidence would have resulted ultimately in a defendant's acquittal.

4.     A post-conviction petition need only state operative facts alleging a constitutional violation and have appended evidentiary materials which are corroborative of the

---

[2]

The Supreme Court held in *United States v. Bagley*, 105 S. Ct. 3375 (1985) that a prosecutor's failure to disclose evidence that could have been used effectively to impeach important government witnesses required reversal of the conviction only if the evidence was material in the sense that its suppression might have affected the outcome of the trial.

[3]

In *Brady v. Maryland*, 83 S. Ct. 1194, the Supreme Court held that suppression by the prosecution of evidence favorable to an accused on request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

allegation in order for the petitioner to be entitled to a hearing on the petition.

(Docket No. 24, Exhibit 2, p. 237 of 291).

On April 14, 2010, Acting Chief Justice Paul E. Pfeifer denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question (Docket No. 24, Exhibit 2, p. 291 of 291).

### b.    The Second Motion for Post-Conviction Relief.

On March 23, 2009, Petitioner, *pro se*, filed a "Second Petition for Post-Conviction Relief" in the court of common pleas (Docket No. 24, Exhibit 3, p. 5 of 241).  He raised these issues:

1.    Trial counsel was ineffective for not using the taped testimony of Mrs. Gordon to impeach her.

2.    Trial counsel never asked Mrs. Gordon about the inconsistencies in her testimony.

3.    The prosecutor presented perjured testimony.

4.    Trial counsel did not use, to Petitioner's detriment, the incident report that contradicted the state's evidence.

(Docket No. 24, Exhibit 3, pp. 8 -38 of 241).

Petitioner attached a handwritten document which purports to bear the notarized signature of Jessica Gordon.  She avers that she was forced to testify and any testimony resulting from such force is not credible (Docket No. 24, Exhibit 3, p. 43-44 of 241).  Judge W. Wyatt McKay denied the Second Petition on the basis that it was untimely filed (Docket No. 24, Exhibit 3, pp. 78-80 of 241).

Petitioner filed a notice of appeal in the appellate court on July 20, 2009 (Docket No. 24, Exhibit 3, p. 81-82 of 241).  In his brief, Petitioner asserted the following assignments of error:

1.    The trial court erred when it failed to recognize that Petitioner had many unavoidable life events that prevented him from discovering the facts.

2.    Trial counsel was ineffective because he failed to use exculpatory evidence during the trial.

(Docket No. 24, Exhibit 3, pp. 90-100 of 241).

10

On March 22, 2010, the court of appeals determined that "having failed to allege or submit any newly discovered evidence de hors the record creating a constitutional error and, further, having failed to demonstrate that but for that error, he would have been acquitted, we determine the trial court properly dismissed Mr. Stoutamire's untimely successive petition for post conviction relief.  Thus we affirm" (Docket No. 24, Exhibit 3, pp. 115-122 of 241).

Petitioner filed a notice of appeal in the Ohio Supreme Court (Docket No. 24, Exhibit 3, p. 123-124 of 241).  In the memorandum in support of jurisdiction, Petitioner conceded that the petition had been untimely filed; however, he had been unaware of the facts until sometime in the middle of "my first post-conviction petition."  His trial counsel's failure to provide his file or respond to correspondences impeded his ability to advance his claims in a timely filed motion for post conviction relief and bolstered his contention that trial counsel's representation was ineffective (Docket No. 24, Exhibit 3, pp 128 -141 of 241).  On July 21, 2010, Chief Justice Eric Brown declined jurisdiction to hear the case and dismissed the appeal as not having any substantial constitutional question (Docket No. 24, Exhibit 3, p. 160 of 241).

**E.     The Petition for Writ of Habeas Corpus.**

Petitioner filed an Amended Petition under Section 2254 for Writ of Habeas Corpus on January 3, 2011.  He alleged the following violations of law:

(1)     The jury was given an additional instruction after deliberations began.

(2)     Prosecutorial misconduct:
        a.      Using perjured testimony
        b.      Making improper remarks during opening and closing arguments.
        c.      Failure to "turn over" the convictions of the State's witnesses.

(3)     Ineffective assistance of trial counsel by failing to:
        a.      Investigate state witnesses criminal convictions.
        b.      Interview state's witnesses.
        c.      Request jury view.

11

d.      Interview Petitioner prior to trial.

e.      Request a continuance.

f.      Move that the bullet shell casings be "suppressed."

g.      Impeach the state's witnesses using inconsistency of statements.

h.      Object to hearsay.

i.      "Regurgitate" evidence without casting any doubt on its invalidity.

j.      Investigate Ms. Gordon's mental status records.

k.      Question detective.

(4)      Prejudicial joinder of offense.

(5)      Trial court erred by failing to give a lessor offense on unlawful restraint.

(6)      Judicial bias.

(7)      Cumulative errors.

(Docket No. 9)

In the Return, Respondent argues that claims of prosecutorial misconduct, use of perjured testimony and making improper remarks during opening and closing arguments, ineffective assistance of trial counsel, failure of trial counsel to instruct regarding a lessor offense of unlawful restraint and judicial bias, have been procedurally defaulted and were not fairly presented to the Ohio courts.  With respect to Petitioner's claim of a *Brady* violation, Respondent claims that there is no *Brady* violation since the information embodied in the material evidence was available from alternate sources and Petitioner had knowledge of and access to such sources.  Petitioner's seventh ground, that the trial court erroneously overruled a request to instruct the jury of lessor included offense, was not cognizable in federal habeas corpus.  Finally, Respondent argues that cumulative error is not a basis for granting habeas relief in a non-capital case.

## II. JURISDICTION.

A federal court has jurisdiction to consider a petition for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the grounds that he or she is in

custody in violation of the constitution or laws or treaties of the United States.  *Leslie v. Randle*, 296 F.3d 518, 521 (6ᵗʰ Cir. 2002) (*citing* 28 U.S.C. § 2254 (Thomson/West 2002)).

In the instant case, Petitioner was convicted in an Ohio Common Pleas Court.  He is confined to the Southern Ohio Correctional Facility Institution in Lucasville, Ohio.  Petitioner asserts that he has been deprived of rights guaranteed him under the Sixth and Fourteenth Amendments.  Such claims, if true, are phrased sufficiently to implicate a violation of the constitution or laws or treaties of the United States.  Since Petitioner has satisfied both prongs of the jurisdictional test, the Magistrate finds that this Court has subject matter jurisdiction to consider Petitioner's Petition for Writ of Habeas Corpus.

### III  HABEAS CORPUS STANDARD OF REVIEW.

Under the AEDPA, a federal court may not grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits unless (1) the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," *Thompson v. Bell,* 580 F.3d 423, 433(6ᵗʰ Cir. 2009) (*citing* 28 U.S.C. § 2254(d)(1), or (2) the state court's decision "was based on an unreasonable application of the facts in light of the evidence presented in the State court proceedings."  *Id.* at 433-434 (*citing* 28 U. S. C. § 2254(d)(2)).  A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* (*citing Williams v. Taylor,* 120 S. Ct. 1495, 1523 (2000)).  An "unreasonable application" occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.*  A federal habeas court may not find a state court decision unreasonable "simply because that court concludes in its independent

13

judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (*citing Williams*, 120 S. Ct. at 1522). Rather, the state court decision must be an "objectively unreasonable" application of federal law to be reversed. *Id.* (*citing Williams*, 120 S. Ct. at 1521).

### IV. DISCUSSION OF THE PETITION FOR WRIT OF HABEAS CORPUS.

Initially, the Magistrate must determine whether Petitioner has complied with the procedural devices established to challenge illegal confinement. If such claims survive the procedural challenge, the Magistrate will address each claim on its merits.

### A.    PROCEDURAL DEFAULT STANDARD.

Failure to present a constitutional claim to the state court is a circumstance that typically precludes federal habeas review. *Cvjetinovic v. Eberlin*, 617 F.3d 833, 836 (6th Cir. 2010) (*see Rust v. Zent*, 17 F. 3d 155, 160 (6th Cir. 1994) ("If a habeas corpus petitioner is barred from presenting one or more of his claims to the state courts because of procedural default, he has waived those claims for purposes of federal habeas corpus review...."). However, "[w]hen a habeas claim is procedurally defaulted, it may nevertheless be considered if the petitioner shows 'cause for the procedural default and prejudice attributable thereto....' " *Id.* at 836-837 (*citing Burroughs v. Makowski*, 411 F.3d 665, 667 (6th Cir. 2005) (*quoting Murray v. Carrier*, 106 S. Ct. 2639, 2643 (1986)); *see also Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009) ("A defendant can overcome a procedural default by showing (a) cause for the default and (b) actual prejudice from it.")).

### 1.    THE MAUPIN TEST.

In determining whether a state court has addressed the merits of a petitioner's claim, federal courts will presume that there are no independent and adequate state grounds for a state court decision absent

14

a clear statement to the contrary. *Hamilton v. Gansheimer*, 536 F. Supp.2d 825, 840 (N. D. Ohio 2008) (*citing Coleman v. Thompson*, 111 S. Ct. 2546, 2557 (1991)). Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Id.* (*citing Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986)). Under the Maupin test, a reviewing court must decide: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and (4) if the above is met, whether the petitioner has demonstrated "cause" and "prejudice." *Id.* (*citing Maupin*, 785 F.2d at 138). As set forth in the last factor of the Maupin test, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* (*citing Coleman*, 111 S. Ct. at 2565). "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Id.* (*citing Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 109 S. Ct. 2070 (1989)). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Id.* (*citing Smith v. Murray*, 106 S. Ct. 2661 (1986)).

2.    **THE MAUPIN TEST APPLIED TO PETITIONER'S CLAIMS OF PROSECUTORIAL MISCONDUCT, INEFFECTIVE ASSISTANCE OF COUNSEL AND JUDICIAL BIAS.**

In invoking the *Maupin* test as it applies to Petitioner's claims of prosecutorial misconduct, ineffective assistance of counsel and judicial bias, the first three prongs for procedural default are met and the case is procedurally defaulted. It is well established under Ohio law that under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from

15

raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was not raised or could have been raised by the defendant at the trial that resulted in that conviction, or an appeal from that judgment. *State v. Perry,* 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967).  Petitioner failed to fairly present his claims of prosecutorial misconduct, ineffective assistance of counsel and judicial bias as a federal constitutional claim under the same legal theories and facts that Petitioner seeks to present in this habeas case.  The failure to comply with this doctrine satisfies the first factor of the *Maupin* Test.

The Sixth Circuit Court determined in *Fautenberry v. Mitchell*, 515 F.3d 614, 633 (6th Cir. 2008), that Ohio's application of res judicata rules in an actually enforced, adequate and independent state ground upon which the Ohio state courts consistently refuse to review the merits of a defendant's claims.  Thus, the second and third factors of the *Maupin* paradigm for claims of prosecutorial misconduct, ineffective assistance of counsel and judicial bias are resolved against Petitioner.

### 3.  HAS PETITIONER DEMONSTRATED "CAUSE" FOR THE DEFAULT?

Petitioner wrote copious arguments on the errors and omissions that the trial counsel, the prosecutor and the judge made (Docket No. 30).  However, he did not provide an explanation for the failure to timely assert these claims in any of his motions for post-conviction relief.  In other words, Petitioner has failed to establish that the alleged errors and omissions made by trial counsel, the prosecutor and judge constituted cause for his default.

Petitioner also asserts that he has proof of actual innocence.  Apparently, Jessica Gordon provided his counsel with a letter in which she recants her testimony.

For purposes of tolling or excusing a default on the basis of a claim of actual innocence, a petitioner must proffer "new reliable evidence."  *Cleveland v. Bradshaw,* 760 F.Supp.2d 751, 758 (N. D.

16

Ohio 2011) (*see Schlup v. Delo,* 115 S. Ct. 851, 865 (1995)).  New evidence includes exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial.  *Id.* at 757 (*citing Schlup*, 115 S. Ct. at 865).  The habeas court must therefore determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record.  *Id.* (*citing Doe v. Menefee*, 391 F.3d 147, 161 (2nd Cir. 2004)).

Petitioner included with his pleadings a copy of what purports to be an affidavit signed by Jessica Gordon.  Petitioner concluded that this affidavit is new for purposes of habeas review and is proof of actual innocence.  The Magistrate concurs that Jessica Gordon's statement is new for purposes of habeas review.  The statement, however, is not reliable (Docket No. 24, Exhibit 3, pp. 43-44 of 241).  The statement is not appropriately notarized and it bears an unintelligible signature.  The statement does not address the merits of Jessica Gordon's testimony or its lack of truthfulness.  It simply explains that she was compelled to testify.  This "new" evidence does nothing to assist Petitioner in establishing actual innocence.

Since Petitioner has not presented evidence that will permit him to prevail on the actual innocence or fundamental miscarriage of justice claims, Petitioner's claims of prosecutorial misconduct, ineffective assistance of counsel and judicial bias are procedurally barred from federal habeas review.

### 4.    EXHAUSTION STANDARD.

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  *Drummond v. Houk,* 2010 WL 5464172, *13 (N. D. Ohio 2010) (*citing* 28 U.S.C. § 2254(b), (c); *see Rose v. Lundy*, 102 S. Ct. 1198, 1205 (1982))  Exhaustion is fulfilled once a convicted defendant seeks review of his or her claims on the merits from a state supreme court.  *Id.* (*citing O'Sullivan v. Boerckel*, 119 S. Ct. 1728, 1732 (1999)).  A habeas petitioner satisfies the exhaustion

17

requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Id.* (*citing Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *citing Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990)).  If, under state law, there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred, and the federal habeas court cannot entertain the merits of the claim.  *Id.*

A petitioner " 'cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.' "  *Id.* at *14 (*citing Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (*quoting Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)).  Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Id.* (*see Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001)).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Id.* (*see Buell*, 274 F.3d at 34).  To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Id.* (*citing Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (*citing Wainwright v. Sykes*, 97 S. Ct. 2497, 2506 (1977)).

**5.      THE EXHAUSTION STANDARD APPLIED TO ALL OF PETITIONER'S CLAIMS.**

In this case, Petitioner failed to present his claims of prosecutorial misconduct, ineffective assistance of counsel and judicial bias to the state court.  Remand to a state court to pursue these claims would be futile as the state courts can no longer entertain these claims.  These claims that were never evaluated because they were never presented to the state court are not cognizable on federal habeas review.

18

However, Petitioner has fulfilled the exhaustion requirements of his claims that the trial court erred in (1) giving an additional instruction to the jury after they began deliberations, (2) ordering that the claims against him be joined, (3) failing to instruct the jury of a lessor included offense and (4) considering the cumulative effect of the errors made in his trial.  The consideration of these claims on the merits follows.

**B.**     **ANALYSIS OF PETITIONER'S FIRST GROUND FOR RELIEF–AN ADDITIONAL JURY INSTRUCTION.**

Petitioner takes issue with the trial court's decision to give an instruction to deliberating jurors who queried "Can the defendant be found guilty of aggravated burglary without handling the gun?"  The trial judge gave the jury an instruction on complicity[4].

When a judge merely restates previously given instructions and neither gives the jury additional instructions or explains those already given, the communication between the judge and jury outside of the defendant's presence is harmless error.  *State v. Baker,* 2008 WL 4710988, *2 -3 (2008) (*citing State v. Abrams*, 39 Ohio St. 53, 56, 313 N.E.2d 823, 825 (1974); *Bostic v. Connor*, 37 Ohio St.3d. 144 149-150, 524 N.E.2d 881, 886-887 (1988)).  However, when the communications are substantive, such as when the trial court provides the jury with further instructions or other substantive information, or clarifies a previously given instruction, and outside the presence of the defendant, prejudice is presumed and a new trial must be ordered.  *Id*. (*State v. Shenoda*, Franklin App. No. 01AP-1409, 2002-Ohio-4296, ¶ 18-19;

---

[4]

Under Ohio law, complicity is:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1)     Solicit or procure another to commit the offense;

(2)     Aid or abet another in committing the offense;

(3)     Conspire with another to commit the offense in violation of section 2923.01 of the REVISED CODE;

(4)     Cause an innocent or irresponsible person to commit the offense.

OHIO REV. CODE § 2923.03 (Thomson Reuters 2011).

*State v. Tillman*, 2004 WL 2676328, * ¶ 32 (2004); *Jones v. State*, 26 Ohio St. 208, 209-210 (1875)).

Supplemental instructions to a jury after deliberations have begun are not per se prejudicial. *Liska v. State*, 115 Ohio St. 283 (1926).  Where during the course of its deliberation, a jury requests further instruction or clarification of an instruction, the trial court has discretion to determine its response to that request. *State v. Carter*, 72 Ohio St. 3d 545, 553, 651 N. E. 2d 965, 974 (1995).  A reversal of the trial court's response to such request requires a showing that the trial court abused its discretion. *Id.*

The Magistrate finds that the supplemental instruction given to the jury after they retired to deliberate was not misleading for four reasons.  First, Petitioner and his counsel were present when the supplemental instruction was given.  Second, the offense of burglary was one of the offenses referred to in the complicity statute that is enumerated in OHIO REV. CODE § 2923.01.  Third, the jury instruction on complicity could have been given in the original jury instruction.  Fourth, there was sufficient evidence that the trier of fact could have concluded that Petitioner was a participant in committing the offense.  For these reasons, Petitioner cannot demonstrate that the trial judge abused his discretion in responding to the jury's request for clarification of law.

Applying the principles for administering an instruction after the jury commences deliberation, the Magistrate does not find that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court or that the state court's decision was based on an unreasonable application of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Petitioner's first ground for relief is meritless and not subject to habeas review.

**C**  **ANALYSIS OF PETITIONER'S FOURTH GROUND FOR RELIEF–PREJUDICIAL JOINDER.**

Petitioner contends that the court erred by denying his motion for severance filed pursuant to OHIO

CRIM.R. 14[5] and granting the prosecutor's request to join his offenses even though there were dissimilar offenses, arising at different times and at different locations.

Under OHIO CRIM. R. 8(A), two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offense charged, whether felonies or misdemeanors or both, are of the same or similar character.  Generally, joinder of offenses is liberally permitted in order to conserve time and expense, diminish the inconvenience to witnesses and minimize the possibility of incongruous results in successive trials before different juries.  *State v. Torres,* 66 Ohio St.2d 340, 343, 421 N.E.2d 1288, 1290 (1981).  However, pursuant to OHIO CRIM R. 14, separate trials may be necessary to prevent prejudice.

The Sixth Circuit has instructed that in order to obtain federal habeas relief on a state law claim such as failure to sever the trials, a petitioner must show that misjoinder of the counts resulted in prejudice **so great** as to deny the defendant his or her right to a fair trial.  *Gillingham v. Warden*, *Pickaway Correctional Institution*, 2011 WL 2789958, *19 (S. D. Ohio 2011).  "Where evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to cumulation of evidence of the inference of a criminal disposition is largely absent."  *Id.* (*citing State v. Hamlin*, 37 Ohio St.3d 153, 159, 524 N.E.2d 476, 481-482 (1988)).  A risk of undue prejudice exists whenever joinder of counts permits introduction of evidence of other crimes that would otherwise be inadmissible.  *Id.* (*see e.g., Bean v. Calderon*, 163 F. 3d 1073, 1084 (9th Cir. 1998)).  The prejudice that a petitioner must demonstrate in order to grant a writ of habeas corpus is actual prejudice, not merely the

---

[5]

If it appears that a defendant of the state is prejudiced by a joinder of offenses or of defendants in an indictment, information of complaint, or by such joinder for trial together of indictments, information or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants or provide such other relief as justice requires.

OHIO CRIM. R. RULE 14 (Thomson Reuters 2011).

potential of prejudice.  *Id.* (*see Herring v. Meachum*, 11 F. 3d 374, 377-378 (2nd Cir. 1993)).

Without question, the evidence adduced in Petitioner's robbery/shooting case was discovered as a result of the domestic dispute between Petitioner and Ms. Gordon.  Petitioner purportedly dragged Ms. Gordon from Red's house, ripping her clothing, engaged her in a fist fight and then brandished a .38 caliber weapon in her direction.  Afterwards, Ms. Gordon disclosed to the police that Petitioner had participated in the robbery/shooting.  Evidence from the domestic violence charges was admissible at a separate trial to prove the robbery/shooting charge.  Severance was not required because prejudice did not result from the cumulation of evidence by the joinder of the two cases.

Alternately, Petitioner has not demonstrated that the trial court's decision concerning severance was contrary to or involved an objectively unreasonable application of a United States Supreme Court precedent.  In fact, Petitioner has failed to show that the admission of evidence for separated offenses in the same trial caused an error of such constitutional magnitude that joinder deprived him of a fair trial.  For these reasons, the Magistrate recommends that habeas relief be denied to Petitioner on his claim of unlawful joinder.

## D.    ANALYSIS OF PETITIONER'S FIFTH GROUND FOR RELIEF–LESSOR INCLUDED OFFENSE.

Petitioner argues that he was deprived of due process of law when the trial court failed to instruct the jury on unlawful restraint, a lessor included offense of abduction.

It is well established in Ohio that a criminal defendant is entitled to a jury instruction on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."  *Jones v. Welch,* 2011 WL 1832760, *6 (N. D. Ohio 2011) (*citing State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).  The test for whether one offense is a lesser included offense of another is set forth in *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), which held that an offense may be a lesser included offense of

22

another offense if (1) the offense carries a lesser penalty than the other; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense.  *Id.*

Under Ohio law, a person is unlawfully restrained if another, without privilege to do so, knowingly restrains another of his or her liberty. OHIO REV. CODE § 2905.03 (Thomson Reuters 2011).  This offense is a misdemeanor of the third degree which means that it carries a penalty of up to seventeen months.  The offense of abduction requires that no person, without privilege to do so, shall knowingly do any of the following:

(1)     by force or threat, remove another from the place where the other person is found;
(2)     by force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear;
(3)     hold another in a condition of involuntary servitude.

OHIO REV. CODE §§ 2905.02 (A)(1), (2), (3) (Thomson Reuters 2011).  The offense of abduction carries with it a sanction of up to five years of incarceration.  OHIO REV. CODE § 2929.14(A)(3) (Thomson Reuters 2011).

The Magistrate finds that unlawful restraint is a lessor included offense of abduction.  The offense of abduction carries a greater penalty than the offense of unlawful restraint.  When the offense of abduction is being committed, so is the lessor included offense of unlawful restraint.  The elements of force or threat are not required to prove the commission of the lesser offense.  The evidence presented at trial would support a conviction on the offense of abduction.  However, the evidence adduced at trial would not support an acquittal on the charge of abduction. Jessica Gordon's unrefuted testimony was that Petitioner pulled her out of Red's house.  A fight ensued and Petitioner put Ms. Gordon in the car.  When she tried to escape, he used a .38 caliber weapon forcing Ms. Gordon into the car and saying "Get in the

23

car.  You want to get shot?"  Ms. Rice, a neighbor, called 911 when she saw that Mr. Stoutamire had a

gun and put it by head and forced her to get out of the car.

This unrefuted evidence demonstrates that Petitioner attempted to restrain Ms. Gordon's liberty

by risk of physical harm or placing her in apprehension of fear.  Petitioner has been unpersuasive in

demonstrating that given this testimony, it was likely that he would be acquitted on the charges of

abduction.  Unable to overcome this threshold, the trial court did not err by refusing to give a jury

instruction that included the lessor included offense of unlawful restraint.

### E.  ANALYSIS OF PETITIONER'S SEVENTH GROUND FOR RELIEF–CUMULATIVE ERRORS.

Petitioner contends that the cumulative effect of the multiple errors made in his trial deprived him

of the right to due process and a fundamentally fair trial under the Fourteenth Amendment.  Petitioner

argues that since the Supreme Court has recognized cumulative error, this Court must consider the

cumulative effect of the trial errors.

The Sixth Circuit has definitively decided in *Moore v. Parker* that courts reviewing a habeas

petition may **not** consider cumulative trial errors in determining whether relief should be granted.  *Rector*

*v. Wolfe,* 2009 WL 1788569, *34 (N.D.Ohio,2009).  Post-AEDPA, not even constitutional errors that

would not individually support habeas relief can be cumulated to support habeas relief.  *Id.* at *35 (*See*

*Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (death

penalty decision stating, "The Supreme Court has not held that distinct constitutional claims can be

cumulated to grant habeas relief.")).

Petitioner cites four Supreme Court cases that suggest he is entitled to relief:  *Taylor v. Kentucky,*

98 S. Ct. 1930, 1936 fn. 15 (1978); *Chambers v. Mississippi*, 93 S. Ct. 1038 (1973); *Sandoval v.*

*California*, 114 S. Ct. 40 (1993); and *Riggins v. Nevada*, 112 S. Ct. 1810 (1992).  However, these cases

are pre-AEDPA, and not Supreme Court precedent, as AEDPA requires.  Because Petitioner failed to cite

Supreme Court precedent post-AEDPA that obligated the state court to consider the alleged trial errors cumulatively, relief on this ground must be denied.

### V. DISCUSSION OF THE MOTION FOR CHANGE OF ADDRESS

Petitioner seeks an order of this Court directing the Ohio Department of Rehabilitation and Corrections to transfer him to another institution. At his present place of confinement, the conditions are less favorable to his family members who must travel a great distance to visit him.

A challenge to the conditions of confinement is generally not cognizable in a habeas case. *Martin v. Overton*, 391 F. 3d 710, 714 (6th Cir. 2004). However, when a prisoner is put under additional and unconstitutional restraints during his or her lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal. *Preiser v. Rodriguez*, 93 S. Ct. 1827, 1841 (1973) (*See* NOTE, DEVELOPMENTS IN THE LAW-HABEAS CORPUS, 83 Harv. L. Rev. 1038, 1084 (1970)).

Additionally, the transfer of state prisoners from one state institution to other state institutions in which conditions are less favorable to the prisoners does not infringe or implicate a liberty interest of the prisoners within the meaning of the Due Process Clause of the United States Constitution. *Harbin-Bey v. Rutter*, 420 F. 3d 571, 577 (6th Cir. 2005) (*citing Meachum v. Fano*, 96 S. Ct. 2532, 2537 (1976)). In other words, the inmate has no due process right to confinement in a particular facility because confinement in any of the state's prisons is within the normal limits or range of custody which the conviction authorizes the state to impose. *Meachum*, *supra*, 96 S. Ct. at 2537.

Petitioner's assertion that his confinement should be in a particular facility does not implicate the lawfulness of his custody or the terms of confinement. Thus, his claim is not cognizable in federal habeas corpus. Moreover, Petitioner has not implied a violation of a liberty interest that this Court could entertain as a basis for habeas relief. The Magistrate recommends that the Court deny the Motion for Change of Address.

## VI. CONCLUSION

For these reasons, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus (Docket No. 1), deny the Motion for Change of Address (Docket No. 37) and terminate the referral to the undersigned Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   October 5, 2011

## VII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.